## Edward F. Dunne, Trustee, Appellee, v. Charlotte H. Cooke, Individually and as Executrix, et al., Appellants.

### Gen. No. 19,881.

1. TRUSTS, § 111*—*what constitutes active trust.* Where a testamentary trustee is required to convey real estate to the beneficiaries upon the death of the testator's widow, and to convey to such beneficiaries at the expiration of such period certain corporate stock, subject to the charge in favor of the widow's annuity, the trust is an active one.

2. TRUSTS, § 200*—*when trustee may maintain action to construe will at expense of estate.* Where testamentary trustees are unable to agree with the beneficiaries as to the manner of the execution of the trust under a will and the amount of compensation for their services, they may, even though the will is free from ambiguity, maintain a suit in equity at the expense of the trust estate for a construction of the terms of the will and to recover compensation for their services.

3. TRUSTS, § 211*—*right of testamentary trustee to reasonable compensation for services.* A testamentary trustee having charge of an active trust is entitled to reasonable compensation for services rendered and reasonable expenses incurred as trustee.

4. TRUSTS, § 211*—*what may be considered in determining compensation of trustee.* The compensation of a testamentary trustee is not to be determined by any established practice or rule, but, in determining such compensation, the responsibility incurred, the amount of the estate, the time and labor properly devoted by the trustee to the discharge of his duties may be considered.

5. TRUSTS, § 212*—*when trustee has right to compensation although in receipt of compensation as executor.* The fact that a testamentary trustee having charge of an active trust has received compensation as executor does not deprive him, as sole surviving trustee, of his right to compensation for services rendered as trustee, provided the duties are separate.

6. TRUSTS, § 212*—*when testamentary trustee who is also executor right to charge fees in both capacities.* A testamentary trustee who has charge of an active trust and is also executor may not charge fees in both capacities for the same services.

7. TRUSTS, § 211*—*when good faith to be considered in determining compensation of testamentary trustee.* Where a testamentary

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

trustee of an active trust, who is also executor, acts in good faith in administering the trust, such conduct should be considered when determining the amount of compensation which he, as sole surviving trustee, is entitled to.

8. TRUSTS, § 211*—*what considered in awarding compensation to testamentary trustee.* In estimating the amount of compensation to be awarded a testamentary trustee, due consideration should be given to the intention of the testator to provide an annuity of a definite sum to his wife for life.

9. TRUSTS, § 211*—*what constitutes basis for estimation of compensation of testamentary trustee.* The amount awarded a testamentary trustee for his services in administering the trust estate should bear a reasonable relation to the value of the trust estate.

10. TRUSTS, § 211*—*what not considered in computing compensation of testamentary trustee.* The fact that the gross sales of a business during a testamentary trusteeship of seven years, the salaries paid to beneficiaries as officers, and the gross rental value of real estate constituted a very large sum should not be used as a basis for determining the amount of compensation to be awarded the trustee, where the trustee took no active part in the business or in shaping its policy, and took no part in the management of the real estate.

11. TRUSTS, § 218*—*when compensation allowed testamentary trustee excessive.* An allowance of $33,000 to a testamentary trustee for fees for himself as trustee and his counsel together with costs, *held* disproportionate to the size of the estate, and excessive.

12. EVIDENCE, § 436*—*when hypothetical question misleading.* A hypothetical question relative to the value of services performed by a testamentary trustee and his counsel, *held* vague, indefinite and misleading where it assumed that the sales of the business were very large and that the estate was very valuable, and contained no reference to the rapidly diminishing income of the business, and all the witnesses wrongfully assumed that the trustee took an active part in the business and dominated its policy when, as a matter of fact, he had only nominal charge thereof.

13. EVIDENCE, § 454*—*when opinion evidence as to value of services of testamentary trustee of little weight.* The opinions of witnesses as to the value of services rendered by a testamentary trustee to the estate is of but little aid in determining the amount of compensation to be awarded for his services as trustee where their answers are based upon a hypothetical question which is vague and misleading.

14. TRUSTS, § 209*—*when attorney acting for testamentary trustee not entitled to compensation.* The duties of a testamentary trus-

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

tee performed by an attorney for the trustee, which are not legal in their character, are not properly chargeable to the estate.

15.    EQUITY, § 397*—*how fees of master in counties of third class fixed.* A master in chancery in a county of the third class cannot arbitrarily fix his fees for examining questions of law and reporting his conclusions, but before he is entitled to demand compensation, it is his duty to have the court determine the amount he should receive.

16.    EQUITY, § 401*—*when stenographer's fees improperly taxed as costs by master.* A charge for stenographer's fees, which has already been included in the fee allowed the master in chancery, is not properly taxable as costs.

17.    TRUSTS, § 200*—*when attorney's fees in action by testamentary trustee to construe will taxed against estate.* Attorney's fees in an action which is maintained in good faith by a testamentary trustee, because of disagreement with the beneficiaries, for a construction of the will as to the manner of executing the trust and to determine the amount to be allowed the trustee as compensation, should be taxed against the estate.

Appeal from the Circuit Court of Cook county; the Hon. EDWARD M. MANGAN, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1913. Reversed and remanded with directions. Opinion filed January 11, 1916. Rehearing denied January 25, 1916.

**Statement by the Court.** This case comes before this court on appeal from a decree of the Circuit Court of Cook county awarding the appellee the sum of $30,-000 as compensation for his services as trustee under the last will and testament of John S. Cooke, deceased, and those of his solicitors and counsel. Appellee was allowed $15,000 for his services; William A. Doyle, one of appellee's counsel, $12,000; and Joseph J. Thompson, as his solicitor in this proceeding, $3,000; $2,500 was allowed the master for his services, and $500 allowed appellee for services of a stenographer.

More than seven years subsequent to testator's death, a bill was filed by the trustees to construe his last will and testament, particularly the fourth provision thereof, and to recover compensation for serv-

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

ices rendered as trustees under said will. John S. Cooke left him surviving Charlotte H. Cooke, his widow, Charles F. Cooke, George J. Cooke and John R. Cooke, his sons, and Irene Welch, his daughter, as his only heirs at law and next of kin. Both John R. Cooke and Irene Welch died during the pendency of the proceedings below. The death of John M. Smyth, one of the said trustees, was suggested of record November 17, 1909, and the cause proceeded in behalf of appellee, as sole surviving trustee. Appellee filed a supplemental bill April 21, 1911. The third and fourth provisions of the will are respectively:

"3rd: I hereby will and devise all my real estate of every description, including leasehold estates, to my friends John M. Smyth and Edward F. Dunne, in trust for the following uses and purposes, to-wit: to be held by them and the survivor of them, for the sole use and benefit of my beloved wife, Charlotte H. Cooke, during the time of her natural life, and after her death for the use and benefit of my beloved children, Charles F. Cooke, George J. Cooke, John R. Cooke and Irene Welch, share and share alike.

"During the life of my wife, I will and direct my trustees to permit my wife, or her authorized agent, to collect all rents and income of the same out of which she shall pay the current carrying charges on said real estate, such as taxes, interest on incumbrances, insurance and repairs.

"After the death of my wife, if my children can agree upon an equitable partition of the real estate, into four parts, and shall so declare to my trustees in writing and request a conveyance in accordance with said agreement, my said trustees, or the survivor of them, shall convey said property to my said children. If my said children cannot so agree upon a division of said property, then my said trustees, or the survivor of them, shall, after the death of my wife, convey to each one of my children requesting it an equal undivided one-fourth of said property.

"4th: I will and bequeath all the capital stock now

owned by me in the Cooke Brewing Company and the Ara Glen Mineral Water Bottling Company to the hereinbefore mentioned trustees, Smyth and Dunne in trust for the following uses and purposes, to-wit: To secure to my wife a yearly income of seven thousand five hundred dollars during her natural life. If the net yearly income arising from my real estate and the sale of any of my personal property which I hereinbefore have bequeathed to her shall amount to said sum of seven thousand five hundred dollars each year, then the stock in said corporation shall not be charged with the payments of any annuity to my wife, but if during any year of my wife's life the income from my real estate and the sale of her personal property shall be insufficient to make up said amount of seven thousand five hundred, then it is my will that the deficiency shall be made good from the dividends on the stocks in said companies and shall be a charge upon said stocks until the same is paid.

"I will and direct that my trustees, or the survivor of them, hold said stock in said corporation for the term of seven years from my death, for the use and benefit of my beloved children, Chas. F. Cooke, George J. Cooke, and John R. Cooke and Irene Welch, subject to the charge in favor of my wife's annuity hereinbefore mentioned. And that during said period the management of said corporation, so far as my stock can control the same, shall be placed jointly in the hands of Charles F. Cooke, George J. Cooke and John R. Cooke.

"At the end of seven years my trustees are hereby directed to convey my stock in said companies, subject to charge in favor of my wife's annuity, to my said children, share and share alike.

"I hereby appoint my friends, John M. Smyth and Edward F. Dunne executors of this my last will and testament, without bond or surety."

The testator bequeathed to his wife all of his personal property, excepting his stock in the Cooke Brewing Company and the Ara Glen Company.

Issues were joined, on both the bill and supple-

mental bill.   The case was referred, testimony taken, findings made by the master and decree entered by the court sustaining all of the master's findings except the seventh, the court finding in that regard that under the terms of the said will, the brewery stock must be held by the trustee until the death of the widow, Charlotte H. Cooke, to make up any deficiency that may accrue in the income from the real estate and to insure that $7,500 per year shall be paid to the said widow as her annuity.   The decree finds that the will was so ambiguous in its terms as to justify and require the filing of a bill for a construction thereof; that the quarrels of the family centered on the trustees, and they were obliged to institute this proceeding in order to secure a decree protecting them in their acts as trustees and in order to secure compensation for themselves and for their counsel; that the brewery was sold because of extravagant management and fatal family quarrels, and that the net proceeds, if any, of such sale, must be invested and held by the trustee to insure the payment of the widow's annuity.   As to the real estate, the decree provides that the trust created by the will must continue until the death of the widow.   The decree further provides that appellee, as the sole surviving trustee, be permitted to resign; that a new trustee be appointed, and that appellee recover from appellants the compensation above stated, and also the costs of this suit.   The decree further finds that the last will and testament of John S. Cooke, deceased, was duly probated and letters testamentary issued to John M. Smyth and Edward F. Dunne, the executors named therein, who immediately entered upon their duties as such; that the estate was settled about seven years thereafter, the executors discharged, and, by order of the Probate Court, were paid the sum of $6,000, as and for their fees as such executors; that the said stock has never been divided, but is still held intact

by the sole surviving trustee, Edward F. Dunne, the appellee; that as to the compensation to be awarded to the trustees, John M. Smyth in his lifetime and during the pendency of this suit, and his legal representative since his death, expressly waived any claim for compensation as trustee, upon the ground that Smyth was acting from motives of friendship for the deceased, and therefore the sole inquiry is as to what compensation should be paid to Edward F. Dunne, the sole surviving trustee. All of the material allegations of said bill of complaint, as amended, and of said supplemental bill of complaint are found to be true.

John S. Cooke died March 12, 1899, and the estate was closed and the executors discharged July 27, 1906. It is admitted that at the time of the final hearing before the master in 1912, the estate had much diminished in value, consisting almost wholly of the realty. All of the property of the brewery was sold December 8, 1910, the affairs of the corporation wound up, and its assets almost wholly applied to the payment of outstanding indebtedness. The construction of the fourth clause of the will is, therefore, unimportant, unless it becomes material to the question of compensation of appellee for services as trustee. It is contended by counsel for appellants, that there is no ambiguity in the will and that there was no necessity or justification for filing the bill in the present case, and that appellee is not entitled to further compensation. The fourth provision of the will provides that: "At the end of seven years my trustees are hereby directed to convey my stock in said companies, subject to the charge in favor of my wife's annuity, to my said children, share and share alike." Demand was made upon the trustees by the Cooke heirs, at the end of the seven-year period, to make such conveyance. The trustees refused such demand, maintaining that it was their duty to hold such stock during the life of Charlotte H. Cooke, to secure the payment of her annuity. It was

contended by counsel for the beneficiaries, and is contended here, that upon the closing of the estate, it was the duty of the trustees, the seven-year period having elapsed, to convey the stock to the children of the testator, and terminate the trust, except as to the real estate. The following letter was addressed to the attorney for the trustees, immediately prior to the filing of the bill in this case:

"November 30, 1906.

"Mr. William A. Doyle,
    Chicago.

"Dear Sir:

"In regard to the Cooke matter, I spoke with Mr. John M. Smyth over the 'phone, and I saw Mayor Dunne personally, and they both gave me to understand that the entire matter is in your hands.

"The will, in my opinion, makes it the duty now of Mr. Smyth and Mayor Dunne, as trustees, to turn over to the children of Mr. Cooke all the stock in the Cooke Brewing Company and the Ara Glen Mineral Water Company, the seven years having more than elapsed since Mr. Cooke's death. Mrs. Cooke desires this to be done, and has signed and left with me a paper releasing Mr. Smyth and Mayor Dunne from any claim which she might have against them as trustees for turning the stock over. The Cooke Brewing Company has already received notice of the charge which will be on this stock in favor of Mrs. Cooke, and a memorandum of this notice has been noted in the stock book of the company.

"I take it from my conversation with you and Mayor Dunne that the trustees insist upon receiving fees for services as trustees before they turn the stock over, and that there may possibly be a disagreement between you and myself as to whether under the terms of the will it is the duty of the trustees to turn over the stock at this time.

"Mayor Dunne was kind enough in the interview which I had with him to say that he would be satisfied to leave the matter to you and myself, and that he would be satisfied to accept any sum as trustees' fees which we might agree upon.

"One difficulty with this is, that Mrs. Welch and Mr. John R. Cooke insist in their talks with me that the trustees are not entitled to any compensation as trustees, and that they have already been amply compensated for their services as Executors. When asked my opinion as an attorney in the matter I cannot lose sight of the decisions holding that trustees must act without compensation, and are not allowed compensation unless the document under which they are made trustees provides for compensation.

"In view of the stand which my clients take, I would have to decline the task of attempting to agree upon an amount with you. Although I would very much like to save annoyance for all parties concerned, still I believe that you and I would only waste time trying to negotiate a settlement between the parties. In the long run it would be better to have the matter submitted to some regularly constituted tribunal. To accomplish this, you might file a bill asking for a construction of the will, and have the questions of trustees' fees adjudicated. If you prefer not to file a bill, then of course I could file a bill on behalf of my clients, setting up that the time to turn over the stock has arrived and asking for a decree compelling the performance of the trust.

"This matter I understand has been dragging on now for several months without any conclusion being reached, and I am fully convinced that it is not to the interest of anybody to let it drag longer. If you will file such a bill as I suggest within the next week, I will be glad to enter the appearance of my clients and bring the matter to a speedy end. If you decide not to file the bill, then I shall feel free at the end of next week to file a bill on behalf of Mrs. Welch and Mr. John R. Cooke.

"Finally, I may say that I am convinced that the stock must be turned over without delay, and without compensation being allowed, or the bill in equity must be filed.

"While I regret very much to appear to bring a suit against either Mayor Dunne or Mr. Smyth, I feel,

none the less, that it is to the interest of all parties concerned to have this matter brought to a close.

Very truly,

(Signed) M. Henry Guerin.''

George J. Cooke succeeded his father to the presidency of the Cooke Brewing Company March 1899, and continued as such president until February 24, 1904. Charles F. Cooke, a brother of George J. Cooke, and Irene Welch, his sister, in 1903, acquired a controlling interest in the company by the purchase of what was known as the Plamondon stock. Thereupon, on June 23, 1903, by action of the Board of Directors of the Cooke Brewing Company, the office of general manager was created; Charles F. Cooke was elected general manager, and George J. Cooke removed from the presidency of the corporation. For a brief interval, viz., February 6, 1904, to February 24, 1904, George J. Cooke again became president, when, on the latter date, Charles F. Cooke succeeded to the office of president and general manager of the brewery. George J. Cooke, at the same time, was elected vice-president of the brewery, without salary, and the evidence tends to show that he was not permitted to take any part in the management or conduct of the business, nor to thereafter enter the office of the company, or to see its books, except under the immediate protection of the court; he represented to the trustees that under the changed policy of the company, the business was diminishing and, if such policy was continued, would be ruined, and that it was their duty, under the fourth provision of the will, to place the management of the corporation, jointly, in the three sons of John S. Cooke, deceased. Charles F. Cooke continued as general manager and president until 1910, when the brewery was sold. The trustees at all times maintained that it was not for the best interests of all concerned that the trustees should do more than elect the children as directors in endeavoring to place the joint

management of the company with the sons. Owing to this difference of opinion as to the duties of the trustees, George J. Cooke, on June 9, 1904, filed a bill, making the trustees parties thereto, to construe that clause of the will which provides "that during said period (seven years) the management of said corporation (the brewery), so far as my stock can control the same, shall be placed jointly in the hands of Charles F. Cooke, George J. Cooke and John R. Cooke."

The evidence tends to show that the affairs of the brewery and the relations of the heirs were harmonious up to June 23, 1903. During 1903 the affairs of the Ara Glen Company were wound up and its outstanding indebtedness paid.

Neither the appellee nor John M. Smyth took any part in the active management of the brewery, either as executors or trustees. Appellee testified in this regard: "I never consulted with George Cooke, while he was president, in regard to the management of the business. * * * I did not assist in the manufacture * * * or the sale of the beer, and I know nothing of my own knowledge * * * about the receipts or the business transactions of the brewery." Under the clause of the will permitting the wife of the testator or her authorized agent to collect all rents and income of the real estate and to pay the current carrying charges thereon, including taxes, interest on incumbrances, insurance and repairs, the trustees did not collect any rents, nor make any repairs. Appellee testified: * * * "Under the will neither Mr. Smyth nor I collected any rents from the real estate. Of my own knowledge, I know nothing about the rents, to whom it was rented, or anything about it. It was attended to, under the provisions of the will by her (Mrs. Cooke's) agent." According to the testimony of Charles F. Cooke, the real estate was rented by the brewery, and the rents collected and paid by the brewery to Charlotte H. Cooke, the widow. The real

estate rented for about $8,300 per annum, from which the brewery paid Charlotte H. Cooke $7,500 per annum, and with the balance paid taxes and other necessary carrying charges. There was some evidence tending to show that the net proceeds of the rents were not at all times sufficient to pay the annuity. Charlotte H. Cooke testified that she received her annuity between the first and tenth of each month from her son Charles F. Cooke; that she never received any annuity from either appellee or John M. Smyth, but, following the death of her daughter Irene Welch, she once communicated by telephone with William A. Doyle (counsel for the trustees) regarding delay in payment of her annuity. The trustees had nothing to do with the declaring of dividends. The dividend checks were prepared and presented by the brewing company to the trustees for their indorsements, and then the trustees distributed such checks to the different heirs. George J. Cooke testified that at one time there was about $34 deducted from each dividend check for the purpose of payment of his mother's annuity. William A. Doyle, as counsel for the trustees, testified that he prepared and took receipts from Charlotte H. Cooke for her annuity, examined accounts sent him by the brewery, checked dividend statements and that on one occasion he had considerable correspondence in regard to a deduction from the dividend check of George J. Cooke.

John S. Cooke was, at the time of his death, the owner of 1,498 shares of the capital stock of the brewery, of the par value of $100 per share; the total capital stock being 2,000 shares; one share was owned by Charles F. Cooke and one share by George J. Cooke, and the remaining shares were known as the Plamondon interest. The stock of the brewery was the principal asset of the estate. At the time of the death of John S. Cooke, the capital stock of the brewery was $200,000, and the total sales of the brewery were

54,000 barrels per year. In 1904, at the time George J. Cooke was finally removed as president and general manager, he testified that the book value of the entire capital stock was $666,000, and that under his management $157,000 in dividends were paid, and the annual sales of the brewery ranged between 72,000 and 75,000 barrels of beer. At the time the witness testified before the master in this proceeding, in 1908, the annual sales of the brewery had fallen to about 40,000 barrels. At the close of Charles F. Cooke's management, the brewery sold its entire plant and business for $160,000. The indebtedness of the brewery at that time was $130,000, in addition to which there was an indebtedness of $22,000 secured by mortgage on other trust property.

During the administration of the affairs of the brewery under the management of Charles F. Cooke, the real estate was sold for nonpayment of taxes. Appellee communicated the situation to Charlotte H. Cooke and her attorney, threatening to remove Charles F. Cooke as real estate agent for Charlotte Cooke. On April 27, 1911, appellee filed a petition in the Circuit Court relative to the condition of the real estate; in pursuance to such petition an order was entered in this proceeding authorizing and directing appellee to collect the rents of the real estate, and to apply the same to its redemption from such tax sales, and authorizing him to borrow money on said real estate for such purpose. On May 13, 1911, appellee filed another petition representing that George J. Cooke had offered to collect the rents for the estate of John S. Cooke without charge or commission, and to mortgage one of the pieces of property for a sufficient amount to redeem all of the properties from impending tax sales; to deduct carrying charges from the rents, and turn the balance over to Charlotte H. Cooke, monthly. With the consent of appellee an order was thereupon entered, May 24, 1911, by the court approv-

ing the appointment of George J. Cooke for the aforesaid purposes.

At various times, legal proceedings, in which the estate of John S. Cooke, deceased, and the trustees were made parties, were instituted. Of the proceedings not concluded during the executorship, one was a suit of P. H. Welch, solely involving the heirs and devisees of his wife, Irene Welch. An answer was filed by the trustees and appellee testified he made an examination of the testimony taken before the master to safeguard the interests of Charlotte H. Cooke. In two of the remaining proceedings George J. Cooke was complainant, in one of which he asked for a construction of the provision of the will heretofore referred to, and in the second proceeding asked for the appointment of a receiver for the brewery and other relief. The latter bill was filed a short time following the appointment of William A. Doyle as counsel for the trustees. The fourth of these proceedings is the present suit.

There is a sharp conflict of evidence as to the extent, character and value of the services rendered by appellee and William A. Doyle, his counsel, which is the principal issue of fact in this case. Appellee testified that numerous conferences were necessitated with his cotrustee, and with various numbers of the Cooke family, including stockholders' and directors' meetings, because of personal differences existing between the children of the deceased, and that he thought there was not a week during which there was not a conference with either one of the heirs, or with his cotrustee, or their attorneys. George J. Cooke testified that the trustees did not attend any stockholders' meetings prior to 1904, which testimony is corroborated by the records of the brewery. The decree finds that the trustees did not, during this period, attend the corporate meetings, but sent their proxies to the stockholders' meetings with directions to elect the

three sons and Mrs. Irene Welch, the daughter, as four of the five directors of the company. Appellee further testified that the minority interests in the brewery, consisting of the Plamondons, were much dissatisfied, contending that the brewery was being conducted wholly in the interest of the Cooke family; that the salaries of the officers were too large, and that by reason of the alleged misconduct of one of the sons, John R. Cooke, for whom a conservator was subsequently appointed, it became necessary to remove him as a director. Appellee further testified that following the filing by George J. Cooke, of the two bills referred to, it became necessary to, and the trustees did, employ as counsel William A. Doyle, to look after the interests of the trust; that since the employment of Doyle, the latter has carried on all litigation. He further testified that the trustees always took care to ascertain whether or not the widow had received her annuity; that on certain occasions when dividend checks were received by the trustees, it became necessary for the latter to bring the heirs together to settle their disputes in that regard. Appellee further testified that, in addition to the matter of nonpayment of taxes, he received various communications and notices relative to the real estate and on August 11, 1910, was served with summons in a certain condemnation proceeding involving a strip of property belonging to the estate. Appellee further testified that because of the difficulties between the heirs, the trusteeship was very arduous, and, at times, very disagreeable. George J. Cooke testified that prior to June, 1903, he had no conferences with appellee; that subsequent thereto he had four conferences, three of which were not over fifteen minutes duration each. John R. Cooke, since deceased, testified that he had only two conferences with appellee and one of them was in regard to closing the estate in the Probate Court. Charlotte H. Cooke testified that the only time she consulted appellee was in

regard to her widow's award.  Charles F. Cooke testi-
fied that he had quite a number of conferences with
appellee in regard to the executorship, but he did not
confer or advise with either of the trustees up to 1904,
and that the other conferences with appellee were not
more than two or three, which were had in regard to
the trusteeship, between January 19, 1904, and Febru-
ary 24, 1904.

William A. Doyle testified that from the time that
he was retained by the trustees as counsel, he was
practically a "third trustee;" that he acted as counsel
for the trustees and also as their representative; that
the trustees were busy and could not give the trust
their attention; he further testified that he was con-
sulted in matters that were the duties of the trustees
by everybody connected with the estate; that he was
unable to state how many hours he spent in the dis-
charge of his duties as counsel for the trustees in con-
nection with litigation in which they were parties, since
he was retained in April, 1904; that he did not keep a
record of the actual time spent, but that altogether he
gave two hundred days of his time, on the basis of five
hours constituting a day's service.  All of the heirs
were represented by counsel and among the services
testified to by Doyle, were frequent conferences with
counsel for the respective parties.  Doyle testified that
he filed an answer to the first bill of George J. Cooke,
and a cross-bill asking the court to fix and allow the
trustees compensation for their services and sufficient
money for the purpose of employing counsel; he testi-
fied that he attended all hearings before the master
in such proceedings and examined 1,034 pages of testi-
mony, but was unable to state the exact time spent
before the master.  Nothing was done regarding the
cross-bill.

Several members of the Chicago bar, in answer to
a hypothetical question setting forth appellee's con-
tention as to services rendered, gave varying opinions

as to the usual, reasonable and customary compensation for such services, as assumed by the question to have been rendered by appellee, from $30,000 to $60,000, and the same witnesses' opinions as to the usual, reasonable and customary compensation for such services as was assumed to have been rendered by appellee's counsel, varied from $15,000 to $30,000. Other members of the Chicago bar, including one of the attorneys for the Chicago Title & Trust Company, upon a hypothetical question setting forth appellants' theory as to services rendered, testified that the usual, reasonable and customary fee for a trustee, for such services, would not exceed $2,500; and that the usual and customary fee for services strictly legal in character, as assumed to have been rendered by appellee's counsel, would not exceed $1,500. The final report of the executors filed in the Probate Court, in 1906, shows the personal property administered to have been of the value of $212,185.93. Joseph J. Thompson was awarded $3,000 by the chancellor as fees for his services rendered as solicitor in this case.

CHARLES GOODMAN, LEE J. FRANK, MARY LEE COLBERT and CHARLES H. PEASE, for appellants.

JOSEPH J. THOMPSON, for appellee.

MR. JUSTICE McGOORTY delivered the opinion of the court.

It is contended by counsel for appellants that the trust in this case is not an active trust, and that it was the duty of appellee, as sole surviving trustee of the estate of John S. Cooke, deceased, when the estate was closed, to terminate the trust, except as to the real estate. It is further contended by appellants' counsel that the will in question is free from ambiguity, and, therefore, the costs of this litigation should not be borne by the estate. It is also urged by appellants that

the compensation allowed appellee, as sole surviving trustee, for his services, that of his counsel, and costs, including master's fees, are clearly excessive; that the hypothetical questions as to trustee's and solicitor's fees are vague, indefinite, and not supported by the evidence; that the findings of the master and the decree of the court are contrary to the law and the evidence, and that for these reasons the decree of the Circuit Court should be reversed.

Where, as here, the trustee is required to convey the real estate to the beneficiaries on the happening of a certain event, viz., the death of testator's widow, and to convey to said beneficiaries, at the end of seven years, certain stock, subject to the charge in favor of the widow's annuity, the trust is not a passive or dry trust.   *   *   *   *Lawrence v. Lawrence*, 181 Ill. 248, 252. In this case the trustees distributed dividend checks, informed themselves as to the payment of the widow's annuity, requiring presentation of her receipts therefor, and performed other duties arising from a trust of this nature.

This court is of the opinion that the bill of complaint of appellee in this cause was not improvidently filed. There was a sharp conflict of opinion between the heirs and the trustees of the estate of John S. Cooke, deceased, in regard to the duties of the trustees under the fourth provision of the will. The trustees were informed in writing, by counsel for the beneficiaries, that if the trustees did not, within a week thereafter, file a bill seeking a construction of the will and for the determination of the question of compensation of the trustees by the court such bill would be filed by the beneficiaries. Six days thereafter, the present bill of complaint was filed by the trustees. In *Warner v. Mettler*, 260 Ill. 416, the court commencing at page 420 says:

" 'Wherever there is any bona fide doubt as to the true meaning and intent of the provisions of the in-

strument creating the trust or as to the particular course which he ought to pursue, the trustee is always entitled to maintain a suit in equity at the expense of the trust estate and obtain a judicial construction of the instrument and directions as to his own conduct.' (3 Pomeroy's Eq. Jur. sec. 1064.) Courts of equity will not only compel the performance of the trust, but they 'will assist the trustees and protect them in the due performance of the trust whenever they seek the aid and direction of the court as to the establishment, *the management or the execution of it.*' (2 Story's Eq. Jur.—13th ed.—sec. 961.) *The difficulties arising in the execution of a trust may make it eminently proper for the trustee 'to apply to a court of equity for its aid and direction in the premises, and we have no doubt of the jurisdiction of a court of equity to afford the requisite relief.'* "

As the personal property of the estate has been disposed of, the construction of the will in regard thereto is not material to the issues in this case. Even though this court may be of the opinion that the will in question is free from ambiguity, yet, under the evidence, it is manifest that the trustees were unable to agree with the beneficiaries as to the proper construction of the will and, under all the facts and circumstances in evidence, they were justified in seeking the intervention of a court of equity for that purpose.

Appellee is entitled to reasonable compensation for services rendered and reasonable expenses incurred as trustee. *Dean* v. *Northern Trust Company,* 266 Ill. 205, 211. This court has held that: "The compensation of a trustee is not determined by any established practice or rule, but in determining such compensation the responsibility incurred, the amount of the estate, the time and labor properly devoted by the trustee to the discharge of his duties are to be considered. What is reasonable compensation depends largely on the circumstances of each case." *Follans-*

*bee v. Outhet*, 182 Ill. App. 213, 216. The fact that appellee received compensation as executor does not deprive him, as sole surviving trustee, of his right to compensation for services rendered as trustee, provided the duties were separate. An executorial trustee may not, however, charge fees in both capacities for the same service. *Arnold v. Alden*, 173 Ill. 229, 234.

The Probate Court fixed the compensation of the executors in this case at the sum of $6,000; they were paid the additional sum of $800 as interest thereon. The Circuit Court by its findings did not separate nor distinguish the services of appellee rendered as executor from those rendered as trustee, although the decree finds that by order of the Probate Court the trustees were paid their fees as such executors. The court finds that considerable time was spent by the trustees in regard to a bill filed by the Plamondons involving more than $30,000. The suit referred to was settled by the executors and referred to in their first report filed in the Probate Court. During the period of the executorship the services performed by the trustees, as such, until June, 1903, when the management of the brewery was taken from George J. Cooke, mainly consisted of the distribution of dividends, ascertainment of receipt by the widow, Charlotte H. Cooke, of her annuity, attending a family conference determinative of a choice between George J. Cooke and Charles F. Cooke for president of the brewing company, attending certain meetings of the stockholders thereof, either in person or by proxy, and holding title to the real estate. Under the third provision of the will, the trustees were directed to, and did, permit the wife of the testator, or her authorized agent, to collect all rents and income of the real estate and to pay the current carrying charges thereon.

Dissensions among the Cooke heirs, covering a period of years, assuming serious form in June, 1903, imposed, thereafter, duties more pressing and onerous

upon the trustees. That the trustees earnestly endeavored, though unsuccessfully, to harmonize the differences which had arisen between the sons of the testator is manifest from the evidence. These efforts of the trustees included many conferences with the heirs, their counsel, and with each other. After the real estate had been sold for taxes, appellee, as sole surviving trustee, took prompt and effective measures to protect the property affected. The litigation between the heirs, instituted by George J. Cooke, to which the trustees were made parties, and other litigation and court proceedings, including the matter of the conservatorship of John R. Cooke, required the attention, to some extent, of the trustees. The constant attendance of trustees' counsel at the several hearings before the master in the proceeding wherein George J. Cooke sought a construction of the will as to the duties of the trustees, was justifiable, even though the several parties were represented by counsel. The trustees were necessary parties to the proceeding and had the right, therefore, to be represented by counsel. It is evident that the trustees in administering the trust acted in good faith, and the question of compensation of appellee, as sole surviving trustee, for services rendered in behalf of the trust should be determined upon that basis. Appellee did not, however, render services to the extent set forth in the long series of findings, in the decree entered by the Circuit Court. The findings of the court that the gross sales of the brewery during the trusteeship were $3,000,000, salaries paid to the children amounting to $175,000, and the gross rental value of the real estate $90,000, though relevant for the purpose of showing the size and character of the trust property, should not be used as a basis or as a determining factor, in arriving at the value of the services of appellee, as trustee. The trustees took no part in the actual management of the brewery, in the selection or management of its em-

ployees, nor in influencing its policy, and took no part in the management of the real estate, the title to which was vested in the trustees. In 1904 the book value of the 1,498 shares of stock held in trust by the trustees was about $500,000. Six years later the complete change in the fortunes of the business is shown in the fact that the entire plant and business of the Cooke Brewing Company was sold for $160,000, less than three-fourths of which proceeds belonged to the trust estate and which was practically all absorbed by outstanding indebtedness of the company. The court by its decree finds that the real estate left by John S. Cooke was worth (presumably at the time of his death) more than $150,000. The only evidence as to the value of the real estate at the time of the entry of the decree is that of George J. Cooke, who testified that the real estate exclusive of the brewery plant was worth approximately $65,000 to $75,000. The personal property belonging to the trust has been practically exhausted. An allowance of $33,000 for the fees of appellee and his counsel, together with costs, including master's fees, is a sum disproportionate to the apparent value of the trust estate at the time of the entry of the decree, regarding the value of which the court below makes no finding. In arriving at an equitable conclusion as to the question of compensation, the amount fixed should bear a reasonable relation to the value of the trust estate. Due consideration must be given to the rights and interests of the widow, to whom the testator willed an annuity of $7,500 per annum, during her life. The intention of the testator should not be defeated if it can reasonably be complied with.

The hypothetical question asked appellee's witnesses assumed that the sales of the product of the brewery during the trusteeship were over $3,000,000, the assets of the Cooke Brewing Company about $600,000, and that the estimated value of the total estate including income was $4,000,000. The hypothetical question

contains no reference to the rapidly diminishing income of the business, commencing in 1904. It is obvious that such assumption must have produced in the minds of the various witnesses the erroneous impression that the trust estate was of great magnitude. The annual sales of the brewery, according to the testimony of George J. Cooke, were about 72,000 barrels in 1904, and in 1908 the annual sales had fallen to about 40,000 barrels. All of these witnesses assumed that the trustees took an active part in the management of the business, or, by the election of the directors, largely dominated its business policy. It is manifest that such hypotheses were misleading, and the opinions expressed by the various witnesses as to the value of the services rendered can be of but little aid to the court. This is further emphasized by the fact that the recitals as to the services of appellee and his counsel, contained in such hypothetical questions, were, in many instances, vague, indefinite and uncertain.

The testimony of appellee's counsel, is, that he was "practically a third trustee; was consulted, considered and run to, in matters that were the duties of the trustee, by everyone connected therewith." In regard to the legal services rendered by appellee's counsel, the evidence tends to show that he was present at all hearings and arguments in the proceedings instituted by George J. Cooke; that he examined all pleadings and filed answers in all cases for the trustees; that he attended practically all of the hearings and arguments of counsel before the master and advised the trustees of such hearings and the evidence heard; that he had numerous conferences with the several lawyers employed by the heirs, reported such conferences and matters relating thereto, to the trustees, and advised with them regarding same; that he attended to all other litigation in which the trustees were parties, or the interests of the beneficiaries involved. The services of William A. Doyle extended over a period of

four years. The evidence tends to show that he, as counsel for the trustees, actively and faithfully discharged his duties as such. The duties of trustee, however, performed by Mr. Doyle, which were not legal in their character, are not properly chargeable to the estate.

It is further contended, by counsel for appellants, that the fees of the master in chancery are excessive. The fee requested by the master, as shown by his certificate and allowed by the court, was $2,500. How such sum is arrived at cannot be determined from an inspection of the master's certificate. A master in a county of the third class cannot arbitrarily fix his fees for examining questions of law and fact and reporting his conclusions thereon, but before he is entitled to demand compensation it is his duty to have the court determine the amount he should receive, and the parties may be heard upon that question. *Schnadt v. Davis*, 185 Ill. 476. Further evidence should be heard to determine the extent and value of the master's services, and as to the reasonableness of his fee.

It is also urged that the court erred in taxing, as costs in the case, the sum of $500 for stenographer's fees, as such item was included in the fee allowed the master. Such allowance is clearly erroneous. *Schnadt v. Davis, supra.*

It is further contended that the court erred in taxing against the estate the solicitor fees allowed to Joseph J. Thompson, as solicitor for appellee in this proceeding, and that such fee should be paid by the appellee. The costs of this litigation should be borne by the estate. *Arnold v. Alden, supra.*

The decree of the Circuit Court is reversed and the case remanded for such proceedings as equity and justice may require, consistent with the views herein expressed.

*Reversed and remanded with directions.*